UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KEVIN T. CYRUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 17-cv-6208 |
| v. | ) | |
| | ) | Judge Sharon Johnson Coleman |
| | ) | |
| CHICAGO TRANSIT AUTHORITY, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kevin Cyrus brings an amended complaint against Chicago Transit Authority ("CTA") alleging employment retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. Currently before the Court is CTA's motion for summary judgment [120]. For the reasons explained below, CTA's motion is granted.

**Background**

The following facts are undisputed unless otherwise noted. CTA is a municipal corporation in Chicago, Illinois. Cyrus began working for CTA on January 13, 2014 as a Maintenance Manager ("M1"). From January 13, 2014 until August 24, 2014, Cyrus worked as an M1 in the "Bus Maintenance" department. Cyrus was voluntarily transferred to "Rail Maintenance" on August 24, 2014 and was assigned to CTA's Howard Shop facility ("Howard Shop"). Cyrus reported to Jeffrey Bell, Thomas Dietrich, Thomas Matuszak, and Donald Bonds.

Part of Cyrus' duties as a manager included entering information in the Maintenance Management Information System ("Maintenance System") as well as generating reports to ensure CTA followed safety hazards. CTA conducts periodic inspections (every 30-120 days) as well as annual inspections of their rail vehicles. Annual inspection managers are required to update the Maintenance System with a code detailing the number of days and miles since the last inspection.

After job shadow training, Cyrus was assigned to the Howard Shop to perform annual inspections during the morning shift. Bell drafted a written warning on October 27, 2014 regarding Cyrus' performance difficulties and stated that Cyrus had problems with: performing his assignments without help from other managers, designating time to learn from managers, using the Maintenance System properly, and following instructions. This written warning was not issued to Cyrus but was sent to Dietrich, one of the General Managers of Rail Maintenance.

Cyrus sent an e-mail to Dietrich on December 18, 2014, concerning an altercation between him and co-worker Thomas Hojnacki. Cyrus also complained about profanity and unprofessionalism at the Howard Shop and being in a hostile work environment.

Cyrus informed Bell and Dietrich on December 18, 2014 that he was meeting with Rita Kapadia, the Equal Employment Opportunity ("EEO") office investigator, regarding altercation. In the meeting, Cyrus specified that he had negative interactions with Bell since October 2014 and believed he was being harassed by Bell because of his race. Cyrus also filed a formal complaint with CTA's EEO office that same day. After an investigation, Kapadia issued a report which concluded that Cyrus' claims were not supported.

Following Cyrus' e-mail and complaint, Dietrich and Bell sought investigatory memos concerning Cyrus from other M1s at the Howard Shop. The majority of memos Dietrich received admitted that profanity was used but was not directed towards Cyrus in particular. In the opinions of several M1s, Cyrus was not performing all the duties assigned to him.

Bell and Dietrich met with Cyrus on January 13, 2015 to discuss performance issues. The statement memorializing the meeting included several issues by Cyrus including: his failure to properly inspect the rails and maintain daily reports; leaving his responsibilities to be performed by other shifts; not responding to the CTA assigned pager; and failing to make service requests in the Maintenance System. The document stated that further incidents would result in discipline. Later that same day, Bell sent an e-mail to Cyrus regarding improper documentation during his shift.

The next month, Seth Wilson, Director of Human Resources, issued a Notice of Written/Performance Improvement Plan citing several continued performance deficiencies. Included in the February 26, 2015 memo were problems such as Cyrus' failure to properly document inspections, generate required reports, properly request time off, and properly discipline a subordinate on his shift. The Improvement Plan stated that Cyrus' conduct violated Rules 7, 14, and 24 of CTA's General Rules book.

Cyrus was assigned to work at a different shop than usual (on 98th street) on March 15, 2015. While there, Cyrus found a set of CTA keys, a radio, and a pager ("CTA equipment") in a restroom locker. Cyrus took the CTA equipment home with him at the end of his shift. The next day, Matt Bianciotto (a fellow rail manager) alerted Cyrus that the CTA equipment was his. Cyrus returned the CTA equipment a few days later. Several members of management met with Cyrus concerning the CTA equipment on March 20, 2015 ("98th Street Incident").

Csyrus filed a complaint with CTA's EEO office on March 23, 2015, alleging that he was being retaliated against for his December 2014 complaint. It is unclear whether an investigation occurred following this complaint or whether the complaint was found to be substantiated by CTA's EEO office.

When Matuszak became Rail Maintenance General Manager in April 2015, he met with Cyrus after being informed by some of his (and other M1s') performance deficiencies. Cyrus

received a Final Written Warning document and was suspended for ten days for misconduct on June 15, 2015. The Final Written Warning stated that Cyrus committed several violations including: taking CTA equipment (during the 98th Street Incident), failing to properly document inspections, not updating the Maintenance System, and failing to monitor labor audits. The document stated that Cyrus' actions violated Rules 7, 12, 14, and 24 of CTA's General Rules book.

Matuszak sent an e-mail on August 10, 2015 seeking volunteers to work during the Air & Water Show taking place on August 15 and 16, 2015 ("Air & Water Show Assignment"). Because he did not get enough volunteers from his initial e-mail, Matuszak sent an e-mail on August 14, 2015 assigning certain CTA employees, including Cyrus, to work the North/Clybourn platform during the Air & Water Show on August 15, 2015. Cyrus was not at work on August 10, 11, and 14, 2015. Cyrus did work on August 12 and 13, however. Cyrus arrived at the Howard Shop on August 15, 2015, where he learned that he was supposed to be working at the Air & Water Show. Although the exact time is unclear, Cyrus left the Howard Shop and arrived at the Air & Water Show Assignment towards the end of the event. Kimbrell and Matuszak met with Cyrus after learning that he missed the Air & Water Show Assignment. Cyrus informed them that because he was out a few days that week, he was not caught up on missed e-mails and, therefore, did not see the assignment.

CTA terminated Cyrus on September 4, 2015. The Notice of Termination listed reasons such as Cyrus' deficient performance following the Final Written Warning and 10-day suspension, missing the Air & Water Show Assignment, failing to properly document inspections and complete required paperwork, and submitting inaccurate information on the "Unusual Occurrence Report." The termination document noted that Cyrus' actions violated CTA General Rules 7, 14, 15, 17, and 24. Kimbrell prepared and issued the notice of termination but received the details from Bell.

Cyrus alleges that CTA retaliated against him for his December 2014 complaint to management and the March 2015 complaint to CTA's EEO office.

**Legal Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *see also* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact, and if done, judgment as a matter of law should be granted in its favor. *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). All evidence and inferences must be viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

**Discussion**

CTA argues that Cyrus' retaliation claim fails as a matter of law. Title VII prohibits an employer from retaliating against an employee for engaging in a protected activity. 42 U.S.C. § 2000e-3(a); *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018) (internal citation omitted). To establish a *prima facie* case for Title VII retaliation, a plaintiff must demonstrate that: (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) a causal connection exists between the two. *Id.* (internal citation omitted). To survive summary judgment on a retaliation claim, a plaintiff must provide evidence that would permit a reasonable fact finder to infer retaliation by the employer. *See Castro v. DeVry University, Inc.*, 786 F.3d 559, 564-65 (7th Cir. 2015) (internal citation omitted). Evidence can include suspicious timing, an indication that similarly situated employees received different treatment, and proof that the employer's proffered reason for the adverse employment action was pretextual. *Id.* at 565. (internal citation omitted).

A plaintiff can also demonstrate a *prima facie* case by showing that: (1) he engaged in a protected activity; (2) he met his employer's legitimate expectations; (3) he suffered an adverse

5

action; and (4) he was treated less favorably than similarly situated employees who did not engage in the protected activity. *Id.* (citing *Sitar v. Ind. Dep't. of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003)). If the plaintiff does this, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse action. *Lewis*, 909 F.3d at 866. The burden then shifts back to the plaintiff to show that the employer's stated reason for the adverse action is pretextual. *Id.*

In the December 10, 2014 e-mail, Cyrus complained of unprofessionalism, the use of profanity, and a hostile work environment, but did not claim that any of this conduct was due to his race. To get Title VII protection, the complaint must indicate that some discrimination occurred because of a protected class, in this case, race. *See Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 901 (7th Cir. 2016) ("Merely complaining in general terms of discrimination or harassment without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient."). As such, the Court will consider the formal complaint of racial harassment made to CTA's EEO office sometime in December 2014 as the protected activity.

Cyrus advances several forms of adverse employment actions that were retaliation to his EEO complaint in December 2014. In addition to the 10-day suspension and termination, Cyrus points to the solicitation of memos in December 2014 and the February 2015 Warning and Performance Improvement Plan as retaliatory conduct by his supervisors. That said, Cyrus does not explain how the solicitation of memos could constitute an adverse employment action. *See Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012) ("[N]ot everything that makes an employee unhappy is an actionable adverse action."). Even the February 2015 Warning and Performance Improvement Plan is not actionable without tangible consequences in employment status. *See Jones v. Res-Care, Inc.*, 613 F.3d 665, 671 (7th Cir. 2010) (stating that "unfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence" are not adverse employment

actions) (internal quotation omitted). Accordingly, the only adverse employment actions in this case are the 10-day suspension and the termination.

*10-Day Suspension*

Cyrus argues that circumstantial evidence demonstrates a causal connection between the EEO complaints of racial harassment in December 18, 2014 and March 23, 2015 with the 10-day suspension that was issued in June 2015. First, Cyrus asserts that CTA was being investigated for discrimination against another African American employee at the time of Cyrus' complaint. Second, Cyrus argues that Kapadia, CTA's EEO investigator, testified that CTA's actions were retaliatory. Third, Cyrus points to CTA's former Human Resources manager, Seth Wilson, who testified that he believed Cyrus was subject to retaliation.

For what it's worth, Kapadia generated a report concluding that the independent investigation of race discrimination, as well as Cyrus' December complaint, were both unfounded. Still, Cyrus does not explain how an independent investigation is evidence of retaliation in his case. Cyrus has not provided, and this Court has not found, any legal support for this argument.

Further, the record does not support Cyrus' claim that Kapadia's testimony indicated retaliation by CTA. A review of the evidence shows Kapadia testified that Cyrus' allegations in his March 2015 complaint rose to the level of a potential retaliation in violation of CTA's EEO policy, which triggered an investigation upon filing. The evidence does not support, however, that Kapadia determined the allegations in the March 2015 complaint to be credible.

The record shows Wilson testified that he believed Cyrus may have been retaliated against following his December 2014 complaint. Wilson further testified that he did not investigate any claims himself, did not have, or speak with anyone with personal knowledge of retaliatory animus, only spoke with Cyrus' counsel about the evidence, and did not review any of the information with CTA. As such, Wilson's testimony about retaliation hardly helps Cyrus' case. *See Smith v. Illinois*

*Department of Transportation*, No. 18-2948, 2019 WL 3938264 *3 (Aug. 21, 2019 7th Cir. 2019) (excluding expert opinion of racial discrimination because of reliance on one set of facts, omission of substantial facts from her analysis, and was based on an "incomplete picture").

But even if this Court gave full weight to Cyrus' "circumstantial evidence" and held that he demonstrated a *prima facie* case of retaliation, he would still lose on summary judgment for failure to show pretext. Cyrus may dispute whether he was meeting CTA's expectations, but his performance stands out for all the wrong reasons. First, it is undisputed that CTA documented performance issues in October 2014, over two months before Cyrus' initial complaint. Next, CTA documented specific performance issues in January and February 2015. Additionally, the 10-day suspension was littered with specific violations of CTA rules, on particular days.

Cyrus does not call into question whether any of these violations occurred, the most damning being the 98th Street Incident. To establish pretext, Cyrus must demonstrate that CTA did not believe its own explanation, not whether it was fair or unreasonable. *See Naik v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 627 F.3d 596, 601 (7th Cir. 2010) (internal quotation omitted). The evidence Cyrus puts forth fails in this regard. As a result, no reasonable jury could find retaliation for the 10-day suspension.

*Termination*

In the Notice of Termination, CTA listed the missed Air & Water Show Assignment as well numerous performance violations in June and July 2015. Cyrus does not, however, make any specific arguments regarding a causal connection between any protected activity (i.e. the March 2015 complaint to CTA's EEO office) and the termination on September 4, 2015. Furthermore, Cyrus does not even attempt to argue that CTA's stated reasons for the termination were pretextual, "meaning that it was a lie." *See Naik*, 627 F.3d at 601.

8

Cyrus argues that even after considering the missed Air & Water Show Assignment, he should have received discipline but not termination. Cyrus also argues that the additional performance violations may not have occurred if he would have received adequate training. Both arguments fail. As the Seventh Circuit has made clear, it is not this Court's role to sit as "super personnel" and second guess training decisions and business judgments that employers should make. *See Riley v. Elkhart Community Schools*, 829 F.3d 886, 895 (7th Cir. 2016) (internal citation omitted). With no causal connection or pretextual arguments, the Court finds that there are no material issues in dispute for trial regarding whether the termination was in retaliation of Cyrus' protected activity.

**Conclusion**

For the reasons explained above, CTA's motion for summary judgment [120] granted. This case is dismissed.

**IT IS SO ORDERED.**

Date: 9/11/2019

Entered: _____
SHARON JOHNSON COLEMAN
United States